Galen SCHRAG, et al., Plaintiffs,

v.

Ted DINGES, Jr., et al., Defendants.

Civ. A. No. 88–1373–FGT.

United States District Court,
D. Kansas.

June 8, 1993.

James C. Dodd, James Craig Dodd & Assoc., Enid, OK, for Galen Schrag.

Dan W. Forker, Reynolds, Pierce, Forker Suter & Rose, Hutchinson, KS, for Charles Brooks.

Richard J. Rome, Hutchinson, KS, for Karolyn Dinges.

Robert J. Roth, Hershberger, Patterson, Jones & Roth, Wichita, KS, for Fred Shaffer.

William L. Mitchell, Mitchell & Henry, Hutchinson, KS, for Robert Simpson.

Thomas D. Kitch, Fleeson, Gooing, Coulson & Kitch, Wichita, KS, for Mark Younger.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This is a civil action brought under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. The plaintiffs allege that the defendants were involved, in various combinations, in four separate fraudulent schemes concerning development of a real estate investment firm called Rexmoor Properties, Inc. ("Rexmoor"). The matter is before the court on motions for summary judgment filed by defendant Mark Youngers (Doc. 679), defendant Robert Simpson (Doc. 742), and defendant Fred Shaffer (Doc. 774). These defendants were officers and/or directors of financial institutions which participated in the financing of the Rexmoor projects. Defendant Youngers was also a director of Paganica, Inc., one of the real estate development firms involved.

Although the defendants have presented arguments relating to each claim against them, this Memorandum and Order deals only with Count I. The court reserves ruling as to the other claims. Defendant Simpson is named only in Count I of the Third Amended Complaint.

The court will begin with a summary of the allegations in plaintiffs' Third Amended Complaint that relate to Count I—also known as the Paganica Supper Club Scheme. Merlin Kaufman, the named plaintiff in Count II, owned a section of land that he was developing into a large residential community, which included a country club and golf course. Defendant Gary Dinges, through his company called Paganica, owned the country club complex and was responsible for managing the development of streets, sewer and water, and marketing the residential lots in Kaufman's development. Some of the residential lots were sold to individual purchasers.

Within the country club complex were a pro shop and supper club, both operated by plaintiffs Schwartz and Meier under a lease agreement between their corporation, S & M, Inc., ("S & M") and Paganica. On April 1, 1981, Paganica entered into a contract (hereinafter referred to as "Management Agree-

ment") allowing S & M to take over operations of the entire country club complex with an option to purchase the complex and golf course for $1 million. The agreement included an express promise that the property subject to the option to purchase would not be further encumbered. The Management Agreement also provided for the sale of twenty percent of S & M stock to Paganica and gave Schwartz and Meier the option to sell their S & M stock in the event that S & M did not exercise the option to purchase.

In 1980, the EPA halted the sale of lots and froze the development due to substandard well and sewer systems. Paganica was directed to repurchase all previously sold lots for the original price plus interest. Paganica installed new water and sewer systems through the issuance of municipal bonds, and attempted to find new purchasers for the lots. However, the lots remained virtually unsold by 1982. The EPA repurchase requirement and the subsequent lack of sales brought Paganica to the verge of bankruptcy.

Hoping to retire Paganica's debt and return the corporation to profitability, Gary Dinges and Jay Ewing devised a plan to start a new corporation, refinance the Paganica debt, transfer Paganica's assets to the new corporation and retire the Paganica refinancing debt through the sale of stock issued by the new corporation, which was to be called Rexmoor Properties, Inc. ("Rexmoor"). The new corporate entity would hold and manage commercial real estate nationwide; property owners would own capital stock in this corporation in return for transferring their real estate to the corporation. The properties transferred to this corporation, however, must be subject to low debt leverage or no debt at all, and must have a positive cash flow after debt service.

Gary Dinges wanted Paganica to exchange its property assets for stock in Rexmoor. However, Paganica and Gary Dinges were deeply in debt, and he had no "debt free" property to transfer to Rexmoor or money to raise the $1 million initial capital investment required to get Rexmoor off the ground.

Defendant Mark Youngers was Chief Financial Officer at Valley Federal Savings & Loan. Youngers was a major stockholder in Paganica. He also owned stock in Americo, another insolvent company run by Gary Dinges. In November 1981, Gary Dinges secretly agreed to trade Youngers' worthless stocks in Americo and Paganica for valuable capital stock in Rexmoor. In addition to this trade, Youngers agreed to help Gary Dinges obtain loans from Valley Federal for the purpose of making Rexmoor a reality.

Gary Dinges, already deeply in debt from his Paganica ventures, approached Valley Federal in November 1981 for a loan to enable Rexmoor to make a public offering of its stock. When the Board of Directors of Valley Federal refused to grant the loan, the president of Valley Federal, defendant Shaffer—who personally stood to profit from the Rexmoor venture—entered into an agreement with Ellinwood Bank, whose president, defendant Simpson, also had a personal stake in Rexmoor. Under that agreement, Ellinwood Bank would loan Paganica $500,000 to be secured by a $500,000 irrevocable letter of credit issued by Valley Federal. As security for Valley Federal's letter of credit, Gary Dinges encumbered the property that was subject to the S & M exclusive option, in violation of the Management agreement. Youngers, as a board member of Paganica and bank officer at Valley Federal, is alleged to have known about the S & M option. Because Paganica had to transfer "debt free" property to Rexmoor in exchange for stocks, Youngers, Shaffer and a fellow bank officer named Brooks decided not to file the mortgage on the Schwartz–Meier property. Simpson, in turn, agreed that Ellinwood Bank would not call Valley Federal's letter of credit if Valley Federal would loan $1 million on an uncreditworthy real estate project known as Hidden Valley, thereby releasing Simpson from a loan guarantee in connection with the Hidden Valley project. Because of the Hidden Valley loan, Simpson later permitted the Valley Federal letter of credit to expire.

The $500,000 loan from Ellinwood Bank was insufficient for Gary Dinges to refinance the Paganica debt and loan Rexmoor part of its required capital. Thus, Valley Federal—through Shaffer, Youngers and Brooks—made several additional major loans to Gary

Dinges and Paganica. To enable Paganica to qualify for loans of such magnitude, Shaffer, Youngers and Brooks intentionally misrepresented Paganica's financial condition. Specifically, the income and assets of Paganica Golf and Supper Club, which belonged to S & M, were misrepresented as Paganica's assets and income.

These fraudulent loans extended by Valley Federal were repaid in May 1984 by Boulevard Bank. Youngers allegedly forwarded correspondence and loan documents, which included the S & M mortgage, to Denis Dieker, vice president at Boulevard Bank, in an attempt to escape detection by the banking authorities.

Rexmoor never lived up to the expectations of its creators. By the middle of 1983, Shearson/American Express and Jessup & Lamont, respected national firms, withdrew as broker-manager for Rexmoor. In July 1983, Coldwell Bankers, the company that performed the appraisals on prospective Rexmoor properties, withdrew its approval to use its appraisals. In January 1984, the SEC refused to permit Rexmoor to go forward and conducted another review of the entire offering. The Rexmoor registration statement was withdrawn from the SEC on February 3, 1984.

The plaintiffs allege that the defendants committed mail fraud on various specified occasions in using the United States Postal Service to deliver correspondence, loan documents, mortgages, and other materials in connection with the fraudulent Paganica Supper Club scheme.

Defendants Shaffer, Simpson and Youngers argue that they should be granted summary judgment as to Count I of the Third Amended Complaint, which is brought by plaintiffs Schwartz and Meier. Defendants present several arguments in favor of summary judgment. However, the court will consider only the issue of whether plaintiffs are the proper parties to assert the RICO claim as it is dispositive of Count I. The allegations set forth above are uncontested for purposes of resolving this issue.

Schwartz and Meier were the major shareholders of S & M. Although plaintiffs were parties to the Management Agreement, it was S & M, not Schwartz and Meier as individuals, who had the option to purchase the Paganica property. The agreement that the property would not be further encumbered related to the option to purchase. Defendants argue, therefore, that the injury alleged is actually an injury to the corporation and not to the individual shareholders, and that Schwartz and Meier do not have standing to bring an action for such injury.

As a matter of general corporation law, an action for damages to a corporation may be brought either by the corporation or, in some circumstances, as a derivative action by the shareholders. Generally, the shareholders cannot sue directly for corporate injuries, including diminution in the value of their stock. *McDaniel v. Painter*, 418 F.2d 545, 547 (10th Cir.1969). The general rule does not apply when the shareholder plaintiff alleges either a distinct injury that other shareholders in the corporation did not suffer or a breach of a special duty between the plaintiff shareholder and the defendant. *Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 640 (9th Cir.1988). Where the general corporation law would prohibit non-derivative suits by shareholders, the prohibition also applies in civil RICO actions. *Id.*; *Crocker v. FDIC*, 826 F.2d 347, 349 (5th Cir.1987); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 29 (1st Cir.1987); *Warren v. Manufacturers Nat'l Bank of Detroit*, 759 F.2d 542, 543–44 (6th Cir.1985). *See also Schultz v. Shelor*, No. 84–4335–S, slip op. at 7, 1989 WL 38687 (D.Kan. Mar. 23, 1989).

Plaintiffs contest neither the facts nor the rules of law set forth above. However, plaintiffs contend that because they were parties to the Management Agreement as well as shareholders in S & M, the defendants breached a special duty to them, which makes them proper parties to bring this action. The court disagrees. The Management Agreement gave plaintiffs the option to sell their S & M stock to Paganica, Inc., under specified circumstances, but it did not provide plaintiffs any rights respecting the option to purchase the Paganica property. Plaintiffs make unsupported and conclusory statements that defendants violated their

contractual rights, but they do not demonstrate any duty owed specifically to them which was violated. Plaintiffs were not injured in their "business or property" except through the alleged injury to their corporation.

It appears that Schwartz and Meier assume they were owed a special duty as individuals because they conducted the negotiations for S & M. That assumption is erroneous. It is hardly remarkable that in forming the Management Agreement defendants spoke to and through the natural persons who controlled the corporation. Corporations, although legal persons, are obviously incapable of conducting their own affairs. They must rely on the input of natural persons. This does not enable those natural persons to bring lawsuits to assert the rights of the corporation. To hold otherwise would create an exception that nearly swallows the rule.

Moreover, plaintiffs do not allege, nor could they show under the facts of this case, that their losses were distinct from those of the other S & M shareholders. The only damages claimed derive from the violation of the promise to the corporation that the Paganica property would not be further encumbered. Any losses plaintiffs suffered, therefore, were shared proportionally by the other S & M shareholders. It is clear, then, that Schwartz and Meier are not the proper parties to assert the RICO claim set forth in Count I of the Third Amended Complaint.

Defendants have argued that Schwartz and Meier lack standing to assert the RICO claim. In fact, many courts have held that shareholders lack standing to sue for injuries to the corporation. *E.g., Sears v. Likens,* 912 F.2d 889, 892 (7th Cir.1990) (RICO case). However, there is some indication that the issue is actually one of real party in interest and should be handled according to Federal Rule of Civil Procedure 17(a). Rule 17(a) provides in pertinent part:

Every action shall be prosecuted in the name of the real party in interest.... No action shall be dismissed on the ground

that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

The Tenth Circuit has stated in a case in which the defendants challenged the joinder of a shareholder-plaintiff both under Rule 17(a) and the standing doctrine:

[T]he standing challenge is not properly raised in connection with real party interest analysis under Rule 17(a). Professor Wright has explained that " '[t]he concept of real party in interest should not be confused with the concept of standing. The standing question arises in the realm of public law, when governmental action is attacked on the ground that it violates private rights or some constitutional principle....' 'Real party in interest' is very different from standing."

*K–B Trucking Co. v. Riss Int'l Corp.,* 763 F.2d 1148, 1154 n. 7 (10th Cir.1985) (citations omitted).[1]

Defendants Youngers, Shaffer and Simpson are the only defendants who seek summary judgment. Whether the matter is one of standing or real party in interest, it is clear that plaintiffs do not have the right to bring the Count I RICO claim. Accordingly, Youngers, Shaffer and Simpson are entitled to judgment as a matter of law on Count I.

The court must decide how to proceed with respect to the remaining defendants, Ted and Gary Dinges, who did not file motions for summary judgment. If the plaintiffs lack standing, then the court does not have subject matter jurisdiction over Count I and must dismiss the claim *sua sponte* pursuant to Fed.R.Civ.P. 12(h)(3). 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3531 (1984).

---

**1.** In *K–B Trucking,* unlike this case, the shareholder was a proper party to the action because he alleged that he was induced to form the cor-

poration by defendants' misrepresentations. *Id.* at 1154.

On the other hand, Rule 17(a) provides that dismissal of a claim not brought in the name of the real party in interest is proper only after a reasonable time for substitution or ratification. In this case substitution and ratification are not feasible because plaintiffs sold their stock in the corporation to a third party, after which the corporation, the real party in interest, dissolved. Another distinction is that a real party in interest defense is not jurisdictional and is waived if not timely raised. There is no issue of waiver in this case because defendants Ted and Gary Dinges raised the standing/real party in interest defense both in their answer and in the pretrial order.

It appears, therefore, that the distinction between standing and real party in interest is of no significance under the facts of this case. Plaintiffs have had three opportunities to address the issue of their right to bring this action. The issue is the same regarding the remaining defendants. Therefore, there seems to be no reason why summary judgment should not be granted as to defendants Ted and Gary Dinges. However, the court will grant plaintiffs thirty (30) days in which to show cause why this court's real party in interest analysis should not apply to those defendants. Summary judgment is at this time granted to defendants Youngers, Shaffer and Simpson as to Count I.

**IT IS BY THIS COURT THEREFORE ORDERED** that defendant Mark Youngers' motion for summary judgment (Doc. 679) is granted in part as to Count I of plaintiffs' Third Amended Complaint. The court reserves ruling on the remaining issues raised in defendant Mark Youngers' motion for summary judgment.

**IT IS FURTHER ORDERED** that defendant Fred Shaffer's motion for summary judgment (Doc. 774) is hereby granted in part as to Count I of plaintiffs' Third Amended Complaint. The court reserves ruling on the remaining issues raised in defendant Fred Shaffer's motion for summary judgment.

**IT IS FURTHER ORDERED** that defendant Robert Simpson's motion for summary judgment (Doc. 742) is hereby granted.

**IT IS FURTHER ORDERED** that plaintiffs show cause within thirty (30) days of the date of this order why summary judgment should not be granted on Count I as to the remaining defendants.